## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **NOEL HUMPHREY,** | ) | |
| **individually and on behalf of all others similarly** | ) | |
| **situated,** | ) | Case No. _____ |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CLASS ACTION COMPLAINT** |
| **BIOLAB, INC. and KIK CUSTOM** | ) | |
| **PRODUCTS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | **DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

COMES NOW, Plaintiff, Noel Humphrey, individually and on behalf of all others similarly situated, by and through his attorneys, and files this Class Action Complaint against Defendants Bio-Lab, Inc. ("BioLab") and KIK Custom Products, Inc. ("KIK"). In support thereof, Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information and belief, based upon the investigation made by and through his attorneys:

## INTRODUCTION

1. On September 29, 2024, a chemical fire broke out at BioLab's chemical manufacturing facility in Conyers, Georgia (the "BioLab Fire"). Around the same time that the fire started, a building sprinkler activated. The sprinkler sprayed water onto water-reactive chemicals stored at the facility. This triggered explosive chemical reactions. Because the source of the ignition was water-reactive chemicals, traditional firefighting methods were unsuccessful. Massive walls of smoke and toxic chemicals spilled into Rockdale County, Georgia, causing severe damage to the individuals and businesses in the area.

1

2.      Plaintiff lives approximately five miles from where the BioLab Fire occurred. Following the fire, Plaintiff was ordered to shelter-in-place for over a week.  He was unable to work during this time.  Despite the heat, he was ordered to turn his air conditioning unit off as part of the shelter-in-place order.  Plaintiff suffered health problems.  Among those were excruciating headaches and difficulty breathing.  He went to the emergency room twice and received breathing treatments.

3.      This Class Action seeks to recover on behalf of the residents, property owners, employees, and businesses living, working, or located in and around the BioLab Fire, which resulted in contamination of, and exposure to, massive amounts of toxic chemicals, such as chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide, phosgene, and other volatile byproduct compounds.  As a result of the BioLab Fire, Plaintiff and putative Class members suffered, among other things, physical injury, medical expenses, loss of use and enjoyment of property, property damage, exposure to toxic material, inconvenience, disruption, and economic damages.

## PARTIES

4.      Plaintiff, Noel Humphrey, is an adult resident of Rockdale County, Georgia, living approximately five miles from BioLab's facility in Conyers, Georgia.

5.      Defendant BioLab is a Delaware corporation with its principal place of business in Ontario, Canada.  It may be served via its registered agent, C T Corporation System, at 289 South Culver Street, Lawrenceville, Georgia, 30046-4805.  At all relevant times, BioLab owned and operated the Conyers, Georgia chemical facility located at 1700 Covington Highway, Conyers, Georgia 30012.

6.     Defendant KIK is a Delaware Corporation with its principal place of business at 101 MacIntosh Boulevard, Concord, Ontario, L4K4R5.  Upon information and belief, BioLab is a wholly owned subsidiary of KIK, referring to itself as a "division of KIK Consumer Products." *See* BioLab, https://www.biolabinc.com/ (last visited October 23, 2024).  Upon information and belief, KIK is a portfolio company owned by the private equity firm, Centerbridge Partners.

7.     At all relevant times, BioLab and KIK acted individually, as well as by and through one another, and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

## JURISDICTION & VENUE

8.     This Court has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. § 1332(d) because this is a class action with diversity of citizenship between parties and the matter in controversy exceeds $5,000,000.

9.     This Court has jurisdiction over each Defendant because they each operated their chemical enterprise in this District.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

### *The Dangers of Trichloroisocyanuric Acid ("TCCA")*

11.     At all relevant times, BioLab operated, and continues to operate, a chemical plant located at 1700 Covington Highway, Conyers, Georgia 30012 (the "Conyers Facility").

12.     Among its operations at the Conyers Facility, BioLab receives, blends, and packages trichloroisocyanuric acid ("TCCA") into finished consumer products.  TCCA is a

3

chlorinating agent used by BioLab to produce products for sanitizing swimming pools and hot tubs.

13.     In large bodies of water, such as pools, TCCA breaks down slowly to release hypochlorous acid (HClO), which kills bacteria, algae and other microorganisms.  However, when TCCA comes into contact with small amounts of water or moisture, a chemical reaction occurs, causing heat generation and the decomposition of the TCCA.  When TCCA reacts and decomposes, it produces toxic chlorine gas and can produce nitrogen trichloride, an explosion hazard.  Chlorine gas is a potentially toxic substance if inhaled, and can cause sinus and lung irritation at even low levels of exposure.

14.     According to KIK's Safety Data Sheet on TCCA, "exposure to the solid [TCCA] or to free chlorine evolving from the product" can cause serious and life-threatening injuries if inhaled.  Per KIK's Safety Data Sheet, TCCA is "fatal if inhaled."

15.     The odor of chlorine gas can be detected at 0.3 parts per million ("ppm").

16.     Airborne chlorine gas > 0.5 ppm exceeds the EPA Acute Exposure Level Guidelines and can cause people to experience notable changes in lung functions.

17.     BioLab's Conyers Facility receives dry TCCA from its Lake Charles facility in Westlake, Louisiana, which had a gas release incident on August 27, 2020 resulting from a chemical reaction.  The August 2020 incident was the subject of a scathing investigation report by the U.S. Chemical Safety and Hazard Investigation Board, which noted several safety issues.

18.     The TCCA received from Lake Charles is packed, shipped, and stored in large containers that hold approximately 2,750 pounds of the material.  Upon information and belief, BioLab has millions of pounds of TCCA inventory at any given time at its Conyers Facility.

*The Fire*

19.     On September 29, 2024 at around 5:30 a.m., a fire suppression sprinkler at the Conyers Facility activated in an attempt to suppress a chemical fire that had broken out at the Conyers Facility.  As a result, water was sprayed onto chemicals inside the Conyers Facility, including TCCA.

20.     After being initially contained, the fire reignited at or around 12:00 p.m.  At the time, workers were attempting to contain the reactive chemicals, thereby resulting in a chemical reaction that produced a massive wall of smoke containing toxic chemicals, including chlorine, hydrochloric acid, hydrogen cyanide, hydrogen bromide, and phosgene rippling throughout Rockdale County.

21.     Firefighters attempted to quell the flames.  However, because the source of the ignition was water-reactive chemicals, traditional firefighting methods were unable to effectively contain the unfolding disaster.

22.     The fire caused a "complete collapse" of the Conyers Facility building.

*BioLab's Failure to Utilize an Effective Fire Protection System*

23.     BioLab did not have an adequate fire protection system to quickly and effectively extinguish fires at their facility while also avoiding causing dangerous chemical reactions with water-reactive chemicals.

24.     This failure to possess and utilize an effective fire protection system exacerbated the harm caused by the fire at the Conyers Facility and delayed emergency response to the fire.

*The Evacuation Alert, Shelter-In-Place, and Business Closings*

25.     At approximately 1:10 p.m., Rockdale County authorities issued an evacuation alert asking residents living between Sigman Road and Interstate 20 near the Conyers Facility to

evacuate immediately and announcing that Interstate 20 would be closing ("Evacuation Alert"), thereby displacing over 17,000 residents.

26.     At the same time, Rockdale County authorities announced the closing of parts of Interstate 20, causing significant traffic delays.  Interstate 20 remained closed on September 30, 2024, causing additional traffic disruptions.

27.     Evacuated residents were unable to return to their homes to obtain personal items and necessities, including medication, technology, and communication devices to inform loved ones of their well-being.

28.     At approximately 7:45 p.m., Rockdale County authorities issued a shelter-in-place order for all residents of Rockdale County ("Shelter-in-Place Order") between 7:45 p.m. and midnight.  More than 77,000 residents were affected and could not leave their homes.

29.     Those sheltering in place were asked by County officials to turn the air conditioning off and keep windows and doors shut.  The Shelter-in-Place order was extended on or about September 30, 2024 and all businesses in Rockdale County were asked to close operations.  *See Updates on Bio Fire (9/29/24 – 10/9/24)*, ROCKDALE COUNTY, GEORGIA, https://www.rockdalecountyga.gov/updates-on-bio-fire-9-29-24/; *Rockdale County Remains Closed with Shelter in Place Continuing*, ROCKDALE COUNTY, GEORGIA (Sept. 30, 2024, 6:58 A.M.), https://www.rockdalecountyga.gov/rockdale-county-remains-closed-with-shelter-in-place-continuing/.

30.     Piedmont Rockdale Hospital evacuated patients and announced that the hospital was on diversion.  Newton County Schools closed.  A litany of other businesses, schools, and government buildings in the area, both in Rockdale and nearby Newton County, were forced to close on September 30, 2024 due to the toxic smoke and dust plume from the BioLab Fire, with

some, such as Conyers City Hall, municipal court, and Conyers University staying closed through October 2, 2024.

31.     The toxic smoke and dust plume caused concern in counties adjacent to Rockdale County.  Neighboring Newton County was forced to close schools and government buildings. Walton County also advised its residents to turn off their air conditioners and ceiling fans and to bring their outside animals indoors, if possible.

32.     Multiple county, state, and federal agencies were integral in responding to the BioLab Fire, including Rockdale County's local fire department, Rockdale County Emergency Management Agency, the Georgia Environmental Protection Division ("EPD"), the Georgia Department of Transportation, the Federal Environmental Protection Agency ("EPA"), and the Federal Emergency Management Agency ("FEMA").  The American Red Cross and DeKalb County Emergency Management established shelter locations and evacuation sites for affected residents.  Neighboring Walton County dispatched its Emergency Management Agency and Fire Rescue to aid in the response.

33.     Air quality surveys performed by the EPD and EPA on September 29 and 30, 2024 detected "the harmful irritant chlorine" emitting from the Conyers Facility.  *See Rockdale County Remains Closed*, *supra.*

34.     Residents living near the Conyers Facility have observed smoke and ash debris on their property and around their homes.

35.     Rockdale County residents, including Plaintiff, have no idea how long the air in their homes will remain poisonous to breathe or how long health advisories will remain in effect.

*Defendants' History of Dangerous Conditions*

36.     The Conyers Facility has a long history of fires and incidents in which hazardous chemicals escaped and adversely impacted residents in the surrounding areas.

37.     On May 25, 2004, the Conyers Facility caught on fire, releasing a plume of caustic smoke that spanned for well over 100 miles, and stretched nearly as far as the South Carolina state line.

38.     The fire originated in a warehouse that housed approximately 12.5 million pounds of pool chemicals and oxidizers.

39.     The 2004 explosion released massive amounts of chlorine and hydrochloric acid into the air.  Hydrogen cyanide, hydrogen bromide and phosgene were also released.

40.     This catastrophe caused the evacuation of all businesses and residences within a 1.5-mile radius.  Nearly thirty people were hospitalized.

41.     On or around June 4, 2016, the Rockdale County Fire Department responded to a chemical decomposition incident at the Conyers Facility.  A fire prompted voluntary evacuations.

42.     In 2017, severe weather led to flooding of Defendants' chemical facility in Crosby, Texas.  The water caused chemicals to decompose and resulted in a massive fire, the release of hazardous chemicals, and the evacuation of area residents.

43.     On September 14, 2020, a TCCA reaction and explosion occurred at the Conyers Facility, closing down Interstate 20, and causing the evacuation of surrounding businesses and over $1 million in property damage.

44.     A 3/8 inch water line leaked sometime between September 12, 2020 and September 14, 2020, covering about 75% of the building floor.  For some reason, there was also unpackaged TCCA on the floor.  The TCCA started to fume and turn milky white.

8

45.     Workers tried to move non-decomposing TCCA super sacks away from the decomposing product, however, the conditions soon became far too toxic to continue rescue operations.

46.     Nine firefighters were hospitalized after inhaling Defendants' toxic vapors.

47.     Four days later, on September 18, 2020, a trailer containing TCCA caught on fire at the Conyers Facility.  It was suspected that some of this TCCA had gotten wet or heated during the September 14 event.

48.     These explosions occurred just weeks after major explosions rocked Defendants' facility in Lake Charles, Louisiana on August 27, 2020.  A very large chemical-based cloud containing hundreds of thousands of pounds of chlorine quickly spread through surrounding areas.

49.     Despite one catastrophic failure after another, Defendants have stubbornly refused to do the bare minimum, or take proper precautions with their volatile and hazardous chemicals, to prevent these toxic chemical reactions and explosions.

***Plaintiff's Experience***

50.     Plaintiff owns vending machines on a route that is very close to the location of the Conyers Facility.  Due to the shelter in place order, customers of Plaintiff's vending machines were unable to purchase items from Plaintiff's vending machines.  As a result, Plaintiff suffered economic losses and damages.

51.     Plaintiff lives approximately five miles from the Conyers Facility.  By virtue of his location, Plaintiff continued to be exposed to the toxic chemicals and suffered side effects, including difficulty breathing and a burning sensation in his throat.  He described his symptoms as bad headaches, watery mouth, burning eyes and throat, chest pains, and difficulty breathing.

52.     Plaintiff was forced to shelter in place for over a week, causing him to lose additional income from his occupation at approximately $200/day.  Plaintiff temporarily relocated, incurring additional relocation and response costs.

53.     As a result of his exposure to the toxic chemicals, Plaintiff went to the Piedmont Hospital twice and received, among other things, breathing treatments, a chest x-ray, and prescriptions.  Plaintiff paid for all of his medical expenses out of pocket.

54.     Because of Defendants' actions, Plaintiff – along with nearly 100,000 other Georgians – lives in fear that his health is at risk and that his home and the neighborhood he lives in is no longer habitable.

## CLASS ACTION ALLEGATIONS

55.     Plaintiff brings this action both individually and as a class action pursuant to FED. R. CIV. P. 23(b)(2) and (b)(3) against Defendants on his own behalf and on behalf of the putative Class defined below:

> All persons, property owners or renters subject to the evacuation or shelter-in-place advisories, and all other persons exposed to chlorine or other hazardous chemicals, as a result of the fire/chemical reaction and release of chlorine and other hazardous chemicals at the Conyers Facility beginning on September 29, 2024.

56.     Plaintiff also seeks to represent a subclass of persons who suffered personal injury (referred to herein as the "Personal Injury Subclass") defined as follows:

> All persons, property owners or renters subject to the evacuation or shelter-in-place advisories, and all other persons exposed to chlorine or other hazardous chemicals, as a result of the fire/chemical reaction and release of chlorine and other hazardous chemicals at the Conyers Facility beginning on September 29, 2024 who suffered personal injury and incurred medical expenses as a result.

57.     Plaintiff also seeks to represent a Subclass of businesses (referred to herein as the "Business Subclass") defined as follows:

All entities transacting business in Georgia that incurred damages as a result of the fire/chemical reaction and release of chlorine and other hazardous chemicals at the Conyers Facility beginning on September 29, 2024.

58.    Unless stated otherwise, the Class and Subclasses are referred to collectively herein as the "Class."

59.    Excluded from the putative Class are Defendants, any entity in which Defendants have a controlling interest, any of the officers, directors, or employees of any Defendant, the legal representatives, heirs, successors, and assigns of any Defendant, anyone employed with Plaintiff's counsel's firms, and any judge to whom this case is assigned and their immediate family.

60.    Plaintiff's putative Class satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements of a class action under Rule 23, as set forth more fully herein.    While the exact number of putative Class members cannot be determined without discovery, it is estimated that the persons who fall within the Class number in the tens of thousands, making joinder of all members impracticable.    Thus, the numerosity standard is satisfied.    Class members may be identified through objective means, including objective data available to the Parties regarding the persons and property present in the affected areas following the fire.    Class members may be informed of the pendency of this class action through direct mail, electronic mail, internet postings, and/or published notice.

61.    There are questions of fact and law common to the Class that predominate over any questions affecting only individual members.    These common questions of law and fact include but are not limited to:

a.    Whether Defendants committed trespass on the property of Plaintiff and the putative Class members by their acts and omissions, including by causing hazardous material to enter and contaminate said property.

b.    Whether Defendants created a private nuisance through their acts and omissions, including the release of toxic contaminants.

11

c.    Whether Defendants created a public nuisance through their acts and omissions, including by the release of toxic contaminants.

d.    Whether Defendants violated Georgia statutory nuisance law by emitting air contaminants and/or endangering the health, safety, or welfare of the public, causing unreasonable injury or damage to property.

e.    Whether Defendants are strictly liable for injuries and damages suffered by Plaintiff and putative Class members because Defendants engaged in abnormally dangerous and/or ultrahazardous activities.

f.    Whether Defendants' acts or omissions set forth herein, breached a duty of reasonable care, and caused or contributed to the fire, chemical reaction, resulting chemical explosion, subsequent release of toxic chemicals, contamination, and evacuation and/or 'shelter-in-place' orders.

g.    Whether Plaintiff and putative Class members have suffered loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or economic damages as a result of Defendants' acts or omissions.

h.    Whether Plaintiff and putative Business Subclass members have suffered a loss of income and/or diminution in value as a result of the Defendants' acts or omissions and subsequent events, including forced closings.

i.    Whether Plaintiff and putative Personal Injury Subclass members were physically injured and incurred medical expenses as a result of Defendants' acts or omissions.

j.    Whether Defendants' conduct constitutes gross negligence or willful and wanton conduct, including related to the fire, chemical reaction/explosion, and subsequent release of toxic and hazardous substances.

62.    The questions set forth above predominate over any questions affecting only individual persons, and a class action is superior with respect to considerations of consistency, economy, efficiency, fairness, and equity to other available methods for the fair and efficient adjudication of the claims asserted herein.

63.    Plaintiff's claims are typical of the putative Class members' claims.  Plaintiff and putative Class members all suffered the same type of harm.  Plaintiff has substantially the same

interest in this matter as all other putative Class members, and his claims arise out of the same set of facts and conduct as the claims of all other putative Class members.

64.     Plaintiff is an adequate representative of the Class because he is a member of the Class and his interests do not conflict with the interests of those he seeks to represent.  The interests of the putative Class members will be fairly and adequately protected by Plaintiff and his counsel, who have extensive experience prosecuting complex class litigation.

65.     Maintenance of this action as a class action is a fair and efficient method for adjudicating this controversy.  It would be impracticable and undesirable for each member of the putative Class who suffered harm to bring a separate action.  In addition, the maintenance of separate actions would place a substantial and unnecessary burden on the courts, which could result in inconsistent adjudications while a single class action can determine, with judicial economy, the rights of all Class members.

66.     Because the damages suffered by certain individual Class members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class members to redress the wrongs done to each of them individually, such that many putative Class members would have no rational economic interest in individually controlling the prosecution of specific actions.  Moreover, the burden imposed on the judicial system would be enormous even if only a small fraction of the putative Class pursued individual litigation, making Class adjudication the superior alternative under FED. R. CIV. P. 23(b)(3)(A).

67.     In addition to satisfying the requirements of Rule 23(b)(3), Plaintiff also satisfies the requirements for maintaining a class action under Rule 23(b)(2).  Defendants have acted and failed to act on grounds generally applicable to Plaintiff and the putative Class, requiring court

imposition of uniform relief. Thus, equitable relief is appropriate for the Class as a whole within the meaning of Rule 23(b)(2).

## COUNT I – TRESPASS

68.    Plaintiff re-alleges and incorporates by reference herein each and every allegation stated above.

69.    Plaintiff has legitimate possessory rights in affected property near the Conyers Facility and legally protected interests.

70.    At all times relevant hereto, Defendants knew or should have known that TCCA, chlorine gas, other contaminants, and byproducts, were hazardous and harmful to real property and humans, and it was substantially certain that improper handling, processing, and/or storage of these chemical materials would cause injury to Plaintiff and the Class Members and their property.

71.    Defendants, through their conduct and omissions, caused hazardous materials to enter and contaminate Plaintiff's and the putative Class members' property.

72.    Defendants' negligent, reckless, and/or intentional conduct and omissions resulted in the chemical fire and the discharge, spread, and release of massive plumes of smoke and hazardous gases.

73.    Defendants caused harmful quantities of chlorine and other hazardous chemicals to be released from the Facility and to enter upon the homes, land, soil, and water of the Plaintiff and putative Class members.

74.    Defendants knew, or should have known, that such discharges would enter onto Plaintiff's and putative Class members' properties.

75.    Defendants' conduct displayed indifference to and disregard for Plaintiff's and the putative Class members' rights to their property.

76.    Defendants, through their activities regarding the Conyers Facility operations and the handling, processing, and storage of hazardous materials, displayed indifference to, and disregard for, Plaintiff's and the putative Class members' rights to their property.

77.    Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the manner of an ordinary, careful person or business.

78.    The invasion, presence, and spreading of the chlorine and other hazardous chemicals released by Defendants from the Conyers Facility unreasonably interferes with the Plaintiff and putative Class members' exclusive right of possession in said properties and constitutes trespass and continuing trespass.

79.    As a direct and proximate result of the trespass and continuing trespass, Plaintiff and putative Class members sustained, and continue to sustain impairment to their legally protected interest in their property as well as economic and property damage.

80.    Plaintiff's and the putative Class members' damages include the need for remediation and continued testing of air, water, and soil to ensure they are safe.

81.    Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiff's and the putative Class members' rights so as to warrant the imposition of punitive damages.

## COUNT II - PRIVATE NUISANCE
### (Violation of O.C.G.A. §§ 41-1-1, 41-1-2, 41-1-4)

82.    Plaintiff re-alleges and incorporates by reference herein each and every allegation stated above.

83.    Plaintiff and putative Class members have legitimate possessory rights in affected property near the Conyers Facility and legally protected interests.

84. In causing and allowing hazardous chemicals to escape from their Conyers Facility into the open air through their reckless and negligent conduct or omissions, Defendants caused hurt, inconvenience and damage to Plaintiff and putative Class members.

85. Defendants invaded Plaintiff's and putative Class members interests in their property, including their interest in the use and enjoyment of their property, causing nuisance.

86. The invasion of the use and enjoyment of Plaintiff's and putative Class members' lands by Defendants was intentional and/or unreasonable.  Defendants knew or should have known their conduct would cause a nuisance to Plaintiff and putative Class members.

87. The noxious chemical plume constitutes a continuing nuisance through the invasion of Plaintiff's and putative Class members' property.

88. Defendants created, maintained and controlled the nuisance.

89. The invasion of the use and enjoyment of Plaintiff's and putative Class members' properties by Defendants was negligent, and/or reckless, and/or caused by an abnormally dangerous activity.

90. Defendants acted with intent in interfering with the use and enjoyment of Plaintiff's and putative Class members' properties and legally protected interests.

91. Defendants' activities violated certain state and local laws, ordinances, and regulations.

92. These state and local laws, ordinances, and regulations are intended to benefit the public and protect them from exposure to harmful quantities of toxic chemical compounds, and to further protect them from interference with the reasonable use and enjoyment of the properties.

93. Defendants operated and maintained the Conyers Facility, which released harmful quantities of chlorine and other hazardous chemicals into the air, soil, and water.

94.     As a direct and proximate result of this nuisance, Plaintiff and the other Class members suffered unacceptable and unreasonable interference with their rights to use and enjoy their properties, interference they should not be required to suffer without compensation.

95.     Plaintiff and Class members in this action have sustained harm that is special and distinct from the harm suffered from the general public: Plaintiff and Class members have lost business opportunities, have been exposed to heightened levels of annoying, obnoxious, foul and disgusting fumes/emissions emanating from the Conyers Facility, and have been forced to evacuate their homes and businesses or to vacate the outdoors on at least one occasion.

96.     Plaintiff's and the putative Class members' special damages and injuries include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, and evacuation and relocation expenses.

### COUNT III – PUBLIC NUISANCE
### (Violation of O.C.G.A. §§ 41-1-1, 41-1-2, 41-1-4)

97.     Plaintiff re-alleges and incorporates by reference herein each and every allegation stated above.

98.     Plaintiff and putative Class members have legitimate possessory rights in affected property near the Conyers Facility and legally protected interests.

99.     In causing and allowing hazardous chemicals to escape from their Conyers Facility into the open air through their reckless and negligent conduct or omissions, Defendants caused hurt, inconvenience, and damage to Plaintiff and putative Class members, causing nuisance.

100.    Defendants' nuisance caused interference to the public at large in the exercise of rights common to all.

17

101.    The release of harmful quantities of chlorine and other hazardous chemicals is an unreasonable interference with the rights common to the general public to enjoy, peacefully and unimpeded, the air, soil, and water in the surrounding community.

102.    The noxious chemical plume constitutes a continuing nuisance through the invasion of Plaintiff's and putative Class members' property.

103.    Defendants created, maintained, and controlled the nuisance.

104.    As a result of Defendants' tortious conduct, Plaintiff and putative Class members suffered injury and special damages.

105.    Plaintiff's and putative Class members' injuries and special damages are the direct and proximate result of Defendants' conduct as alleged above.

106.    Plaintiff's and the putative Class members' special damages and injuries include, but are not limited to, their hurt, inconvenience, loss of use and enjoyment of property, loss of right to enjoy possession of their property, the depreciation or reduction in their property's market, usable, or rental value, the loss or depreciation of property or business value, and evacuation and relocation expenses.

## COUNT IV - STRICT LIABILITY

107.    Plaintiff re-alleges and incorporates by reference herein each and every allegation stated above.

108.    At all times mentioned herein, Defendants were engaged in the handling, processing, and storage of thousands of tons of TCCA, as well as other toxic or hazardous chemicals, which constitutes abnormally dangerous and/or ultrahazardous activity.

109.   Defendants' handling, processing, and storing of these hazardous chemicals at their Conyers Facility, created foreseeable and significant potential harm to people and property in the surrounding area.

110.   Because these activities are abnormally dangerous and/or ultrahazardous, Defendants are strictly liable for any injuries proximately resulting from them.

111.   Defendants are strictly liable for any and all damages which may occur or arise out of their distribution, transportation, storage, use, and handling of chlorine and other hazardous chemicals regardless of their standard of care.

112.   The harm to Plaintiff and the putative Class members, as alleged in this Complaint and incorporated by reference, was and is the kind of harm that would be reasonably anticipated based on the risks created by handling, processing, and storing large quantities of hazardous chemicals near residential, commercial, and agricultural areas.

113.   As a direct and proximate result of Defendants' ultrahazardous activities, Plaintiff and the putative Class members have suffered and will continue to suffer decreased property values, damage to their real and personal property, interference with enjoyment of life and/or use of property, aggravation, an increased risk of associated disease or illness and a fear of the same, lost wages, loss of business income, and loss of business goodwill.

114.   Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiff and the putative Class members, which were a direct and proximate result of the BioLab Fire and release of hazardous substances which harmed Plaintiff and the putative Class as described above.

115.   Defendants' conduct as alleged herein shows that Defendants acted with gross neglect, willfully and wantonly, maliciously, with aggravated or egregious fraud, and/or

intentionally disregarded Plaintiff's and the putative Class members' rights so as to warrant the imposition of punitive damages.

## COUNT V – NEGLIGENCE

116.    Plaintiff re-alleges and incorporates by reference herein each and every allegation stated above.

117.    Defendants actively participated in the processing, handling and storage of hazardous chemicals at their Conyers Facility, and as such owed duties of care in that regard.

118.    Defendants owed a duty to maintain, monitor, oversee, inspect, and control the Conyers Facility to avoid the release of harmful chemicals into the surrounding community.

119.    Defendants breached these duties, and others, by negligently packaging, maintaining, storing, controlling, overseeing, inspecting, and/or monitoring the hazardous chemicals.

120.    Further, Defendants breached these duties by allowing the hazardous chemicals to burn, react or otherwise escape from the Conyers Facility into the surrounding community.

121.    Defendants owed Plaintiff and the putative Class a duty to exercise due care in the manufacturing, maintaining, controlling, overseeing, inspecting, and handling of hazardous chemicals.

122.    Defendants breached these duties, and others, by negligently manufacturing, maintaining, controlling, overseeing, inspecting, and/or monitoring the hazardous chemicals.

123.    Further, Defendants breached these duties by allowing the hazardous chemicals to burn, react, or otherwise escape from the Conyers Facility into the surrounding community.

124.    Given the proximity of neighboring property owners, residents, workers, and businesses, and the propensity of catastrophic damage to those individuals and entities in the event

of a fire or chemical explosion, Defendants owed and breached a duty to implement and promote safety procedures in every area of their operations.

125.    Defendants owed and breached a duty of reasonable care commensurate with the risks associated with receiving, handling, processing, and storing hazardous and toxic materials.

126.    Defendants were required to conform their conduct to applicable federal, state, and local legal requirements, including without limitation the federal Clean Air Act, the federal Clean Water Act, the federal Resource Conservation and Recovery Act, the federal Comprehensive Environmental Response Compensation and Liability Act, including specifically the Emergency Planning and Community Right-to-Know Act, Georgia Water Quality Control Act, the Georgia Waste Control Act, the Georgia Hazardous Site Response Act, the Georgia Comprehensive Solid Waste Management Act, and the regulations promulgated pursuant to the statutes.

127.    Plaintiff and putative Class members are members of the Class of persons for whom legal requirements applicable to Defendants' conduct were designed to protect.

128.    As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiff and the other putative Class members suffered property damage, lost profits, loss of use, and expected diminution of property value.

129.    As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiff and the other putative Class members have incurred, and will continue to incur, monetary damages arising from the property damage, lost profits, loss of use, and diminution of property value at an amount to be proven at trial.

130.    As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiff and the putative members of the Personal Injury Subclass have incurred, and will continue to incur, medical expenses, pain and suffering, and mental anguish.

131.    As a direct and proximate cause of one or more of the aforementioned negligent acts or omissions, Plaintiff and the putative members of the Business Subclass have incurred, and will continue to incur, lost profits.

### COUNT VI – WILLFUL/WANTONNESS

132.    Plaintiff re-alleges and incorporates by reference herein each and every allegation stated above.

133.    At all times relevant, Defendants owed a duty to refrain from grossly negligent, willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiff and the putative Class members.

134.    Defendants were, at all times relevant, aware that TCCA is toxic and harmful to humans.

135.    Defendants were aware, at all times relevant, that considerable safety and care was required in the handling, processing, and storage of TCCA.

136.    Defendants were aware, at all times relevant, when TCCA comes in contact with or is moistened by a small amount of water, it can experience a chemical reaction, generating heat and causing the decomposition of the chemical, which in turn produces toxic chlorine gas and can produce explosive nitrogen trichloride.

137.    Defendants, at all times relevant, had thousands of tons of TCCA stored at their facility.

138.    Defendants were aware, at all times relevant, that this volume of TCCA posed a significant risk for a catastrophic chemical fire.

139.    Defendants were aware, at all times relevant, that tens of thousands of people were at risk of injury should there be a chemical fire at their facility.

140.    Upon information and belief, Defendants were aware, at all times relevant, that as little as 0.5 ppm of airborne chlorine gas, could cause injury.

141.    In fact, Defendants previously had multiple chemical fires involving large quantities of TCCA that resulted in evacuations and shelter-in-place orders to the surrounding communities.

142.    In a 2010 hazard analysis conducted at Defendants' Lake Charles facility, it was advised that the company evaluate its warehouse roof to ensure that it was not susceptible to damage from high winds and/or being exposed to rainwater.  However, Defendants disregarded this recommendation.

143.    In 2017, severe weather led to flooding of Defendants' chemical facility in Crosby, Texas.  The water caused chemicals to decompose and resulted in a massive fire, the release of hazardous chemicals, and the evacuation of area residents.

144.    Following this incident, the Centers for Chemical Process Safety issued new industry guidance to help hazardous chemical facilities, like BioLab, ensure they were prepared for severe weather events, like flooding, so chemical incidents could be prevented.

145.    However, Defendants elected not to implement the industry guidance and continued operating at their Lake Charles facility, unprepared for severe weather.

146.    On August 27, 2020, Defendants' Lake Charles facility suffered damage to buildings storing TCCA, allowing rainwater to come into contact with the chemical and initiating a chemical reaction that resulted in a catastrophic fire, releasing a large plume of hazardous gases,

including toxic chlorine gas, into the air.   This resulted in a shelter-in-place order in the community.

147.   Despite knowing that water coming into contact with stored TCCA could result in catastrophic damage – risking injury to employees and neighboring residents and businesses – Defendants' Conyers Facility was not equipped with an automated water detector or alarm system to alert employees of a leak.   Areas storing TCCA did not have any active floor drains and maintenance was not proactively done to guard against water hazards.

148.   As discussed in the Factual Allegations, *supra*, Defendants have had a history of incidents that have harmed the public.

149.   On or around May 25, 2004, a warehouse at the Conyers Facility containing roughly 12.5 million pounds of chemicals burned.   This fire caused thousands of residents to evacuate.

150.   On or around June 4, 2016, the Rockdale County Fire Department responded to a chemical decomposition incident at the Conyers Facility.   A fire prompted voluntary evacuations.

151.   On September 14, 2020, a water line leak in the Conyers Facility resulted in TCCA decomposition and release of large amounts of chlorine gas.   Georgia Interstate 20 was shut down for six hours while chemical plumes were emitting from the Conyers Facility.   Air monitoring stations were later set up in residential areas and business properties near the facility.   Measured chlorine concentrations were as high as 12 ppm (chlorine gas is immediately dangerous to life at a concentration of 10 ppm).

152.   Four days later, on September 18, 2020, a second TCCA decomposition event occurred at the Conyers Facility, again releasing chemical plumes of toxic chlorine gas into the air.   It was determined that this event occurred due to BioLab's efforts to save, relocate, and/or store bags of TCCA that had likely gotten wet from the September 14, 2024 event.

153.    Defendants were absolutely aware, at all times relevant, of the considerable risks of TCCA decomposition that could result in the unreasonably dangerous emission of hazardous materials, including chlorine gas, into the surrounding community.

154.    Defendants' repeated incidents involving similar fires, smoke plumes, chemical releases, and toxic smoke and dust emissions from the Conyers Facility reflect a pattern of bad faith, reckless, and willful and wanton conduct on the part of Defendants.  Defendants' failure to address the causes of previous incidents and allowing the BioLab Fire to occur without adequately updating fire protection systems and emergency procedures represent bad faith, reckless, and willful and wanton conduct on the part of Defendants.

155.    Defendants' misconduct has been willful, malicious, and in reckless and wanton disregard for the rights of Plaintiff and putative Class members.  As such, Defendants should be required to pay punitive damages in an amount that will deter such misconduct in the future.

### COUNT VII – MEDICAL MONITORING

156.    Plaintiff re-alleges and incorporates by reference herein each and every allegation stated above.

157.    As a direct and proximate result of Defendants' acts and/or omissions, Plaintiff and putative Class members face an increased susceptibility to injuries and this irreparable threat to their health can only be mitigated by the creation of a fund to provide for a medical monitoring program, including: funding of a study of the long term effects of exposure to chlorine and other hazardous chemicals, funding a study of the long term effects of chlorine and other hazardous chemicals within the human body, gathering and forwarding to treating physicians information relating to the diagnosis and treatment of injuries which may result from exposure to chlorine and

other hazardous chemicals, aiding in the early diagnosis and treatment of resulting injuries, and providing funding for diagnosis and preventable medical treatment.

158.    Plaintiff and putative Class members have no adequate remedy in law in that monetary damages alone do not compensate for the insidious and continuing nature of the harm to them, and only a monitoring program which notifies the recipients of an aid in correcting the problems can prevent the greater harms which may not occur immediately but which may be preventable if proper research is conducted and the health risks are diagnosed and treated before they occur or become worse.

159.    Plaintiff and putative Class members have suffered irreparable harm as alleged herein and, in the absence of equitable relief, will suffer further irreparable harm from exposure to chlorine and other hazardous chemicals.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and all others similarly situated, respectfully requests relief as follows:

a.    An order certifying this case as a class action;

b.    An award of statutory, compensatory, incidental, consequential, and punitive damages and restitution to the extent permitted by law in an amount to be proven at trial;

c.    An order enjoining Defendants' unlawful conduct;

d.    An award of attorneys' fees, expert witness fees and costs as provided by applicable law;

e.    An award of expenses of litigation pursuant to O.C.G.A. § 13-6-11 because Defendants' actions evidence a species of bad faith;

f.    An award of interest as provided by law, including pre-judgment and post-judgment interest;

g.    Such other and further relief as this Court may deem just, equitable, or proper.

## **JURY DEMAND**

Plaintiff hereby requests a trial by jury of all issues so triable.


Dated:   October 30, 2024                    /s/   Rodney E. Miller
                                             Rodney E. Miller (GA Bar No. 779467)
                                             **METHVIN, TERRELL, YANCEY,**
                                             **STEPHENS & MILLER, P.C.**
                                             2201 Arlington Avenue South
                                             Birmingham, Alabama 35205
                                             Telephone: (205) 939-0199
                                             Facsimile:  (205) 939-0399
                                             Email:  rmiller@mtattorneys.com

                                             *Attorney for Plaintiff*



**DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL AS FOLLOWS:**


BioLab, Inc.
c/o Reg. Agent, CT Corporation System
289 South Culver Street
Lawrenceville, GA  30046-4805


KIK Custom Products, Inc.
c/o Reg. Agent, The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE  19801